UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **BRUCE ZAK,**<br>an individual,<br><br>Plaintiff,<br><br>vs.<br><br>**FACEBOOK, INC.,**<br>a Delaware corporation,<br><br>Defendant. | **4:15-CV-13437-TGB-MJH**<br><br><br>**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART FACEBOOK'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NON-INFRINGEMENT (ECF NOS. 124, 133, 152)** |

In this patent infringement case, Plaintiff Bruce Zak ("Zak") alleges that Defendant Facebook, Inc. ("Facebook") infringes a patent on Zak's web site technology, U.S. Patent No. 9,141,720 (the "'720 Patent").

Presently before the Court is Facebook's motion for partial summary judgment of non-infringement. The parties have submitted written briefs explaining their positions on infringement.[1] The Court held oral argument on August 13, 2021. *See* Notice of Mot. Hr'g, ECF No. 158; Mot. Hr'g Tr., ECF No. 162. For the reasons stated in this opinion

---

[1] Def.'s Mot. Partial Summ. J. Non-Infringement ("Facebook's Motion"), ECF No. 124; Pl.'s Opp'n Def.'s Mot. Partial Summ. J. Non-Infringement ("Zak's Opposition"), ECF No. 133; Def.'s Reply Supp. Mot. Partial Summ. J. Non-Infringement ("Facebook's Reply"), ECF No. 152.

1

and order, the Court will **GRANT** in part and **DENY** in part Facebook's motion for partial summary judgment of non-infringement.

## I. PROCEDURAL HISTORY

The '720 Patent, entitled "System and Method for Managing Content on a Network Interface," was filed in the United States Patent and Trademark Office ("USPTO") on July 11, 2014 and issued on September 22, 2015. The '720 Patent is a third-generation continuation in a patent "family" whose original "parent" application was filed on February 12, 2003. *See generally* Facebook's Mot. Ex. 1 ("'720 Patent"), ECF No. 124-2.

On September 29, 2015, Zak filed this patent infringement case against Facebook, originally alleging that Facebook infringes the '720 Patent and another member of the same patent family, U.S. Patent No. 8,713,134 (the "'134 Patent"). Pl.'s Compl., ECF No. 1. On August 30, 2016, by stipulation of the parties, Zak's infringement claims as to the '134 Patent were dismissed with prejudice. Stipulation, ECF No. 31; Order Granting Stipulation, ECF No. 32. Zak alleges that Facebook infringes Claims 2-13 [2] of the '720 Patent in connection with its ubiquitous Facebook and Instagram web sites and native apps. Facebook

---

[2] Facebook's Motion is directed to Zak's allegations that Facebook infringes Claims 2-10 in connection with certain features presented on its web sites and native apps. Zak's infringement allegations concerning Claims 11-13 are not presently before the Court on summary judgment.

answered on November 30, 2015, alleging that the '720 Patent is invalid and denying that it infringes the '720 Patent. Def's. Answer, ECF No. 9.

On September 12, 2016, the Court denied Facebook's original motion for summary judgment of patent ineligibility, holding that representative Claim 2 of the '720 Patent recites patent eligible-subject matter. Op. & Order Den. Def.'s Mot. Summ. J. ("Original Order"), ECF No. 36.

In response to this lawsuit, Facebook filed four petitions before the USPTO's Patent Trial and Appeal Board ("PTAB") seeking to challenge the non-obviousness of certain claims of the '720 Patent through a process known as *inter partes review* ("IPR"). On April 4, 2017, the PTAB denied Facebook's IPR petitions, and no IPRs were instituted. *See Facebook, Inc. v. Zak*, Nos. IPR2017-00002, IPR2017-00003, IPR2017-00004, IPR2017-00005 (P.T.A.B. Apr. 4, 2017).

On October 12, 2018, the parties filed a joint stipulation on the constructions of some claim terms within the '720 Patent. Stipulation, ECF No. 70. On February 6, 2020, the Court issued an order construing the disputed claim terms within the '720 Patent that are material to the infringement and validity issues in this case, pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). Order Construing Disputed Claim Limitations ("*Markman* Order"), ECF No. 97.

## II. BACKGROUND

The Court provided an extensive background of the facts of this case in its original summary judgment order and elsewhere. *See* Original Order (reported at *Zak v. Facebook, Inc.*, 206 F. Supp. 3d 1262 (E.D. Mich. 2016)), ECF No. 36; *Markman* Order (reported at *Zak v. Facebook, Inc.*, 2020 WL 589433 (E.D. Mich. Feb. 6, 2020)), ECF No. 97. In summary, plaintiff Bruce Zak[3] was a skilled computer programmer who left his job at Microsoft in the early 2000s to start a new company in Michigan called EveryWare, Inc. ("EveryWare"). EveryWare was formed around 7Ware, a software product developed by Zak with input from coinventor Regina Wilson (who at the time of the invention was Regina Zak, Bruce Zak's wife). The original parent application of the '720 Patent was filed on 7Ware on February 12, 2003.

## III. '720 PATENT

### A. Patented System

The '720 Patent is directed to a system for managing web site content. The specification contemplates that prior to the '720 Patent, existing web site technology was focused on creating advanced features. These advanced features required technical personnel with increasingly sophisticated levels of expertise in the information technology used to manage web sites. According to the specification, existing web site technology thus created problems with keeping web sites up to date. Even

---

[3] Mr. Zak passed away at the age of 55 on July 14, 2021.

for large entities with substantial resources, there might be a limited number of technical personnel. Moreover, technical personnel might not be best situated to manage web sites from a content standpoint. Accordingly, even routine content management might require multiple interactions and communications between different personnel in different roles. The specification contemplates that the key to solving these problems is customizable and automated features that would allow non-technical users to control the information technology used to manage web sites. Allowing non-technical users to manage content without the assistance and intervention of technical personnel saves time, resources, and the possibility of errors, and supports the allocation of content responsibilities. '720 Patent 1:13-2:15, ECF No. 124-2 at PageID.7019.

## B. Claims

The parties have agreed that Claim 2 of the '720 Patent is representative of the asserted claims. In this opinion and order, the Court will refer to representative Claim 2 unless the issues raised by the parties require distinguishing between the asserted claims. Representative Claim 2 recites:

> **2**. A system, including a computer and a web site, for managing content displayable on the web site to multiple users of the system who have profiles stored on the system, comprising:
>
> at least a first configurable application and a second configurable application, wherein each of the first and second configurable applications

includes content that is stored on the computer and that is displayable to the users of the web site, and wherein one of the applications is a biography application that is managed by the computer and that displays biographical information that is received from and that is about one of the users of the system;

wherein at least one of the configurable applications is generated by the computer at least in part based on inputs received from multiple users of the system, the inputs including at least one of text, graphics, sounds, documents, and multi-media content;

an administrator portal through which users of the system are permitted to act in the role of an administrator of certain web pages, wherein a user acting in the role of an administrator may manage business rules that utilize profiles of the users of the system to control interaction of the users with the certain web pages, wherein each user of the system is permitted to act in the role of an administrator at least with respect to a subset of web pages on the web site; and

at least one configurable link on the web site that points to at least one of the plurality of configurable applications,

wherein the at least one configurable link is generated by the computer based at least in part on a profile attributed to at least one user of the system and at least one rule that is configurable by a user acting in the role of an administrator and which applies user profiles to select what content stored on the computer can be viewed by which of the users of the system.

*Id.* 22:52-23:20, ECF No. 124-2 at PageID.7029-7030.

Stripped of excess verbiage, representative Claim 2 recites a computer-based system for managing user interaction with web site content. In addition to the computer and the web site, the claim language involves user profiles, configurable applications, configurable business rules, configurable access rules, and configurable links. More specifically, the claim language centers on the relationship between a configurable application whose content is stored on the computer and displayable to users, a configurable access rule that applies user profiles to select what content can be viewed by which users, and a configurable link on the web site that points to the configurable application. According to the claim language, the configurable application is generated by the computer based on user inputs. Zak identifies the configurable link in particular as a point of novelty over the prior art. According to the claim language, the configurable access rule is configurable by an administrator via an administrator portal, and the configurable link is generated by the computer based on a user profile and the configurable access rule.

## C. Constructions

With respect to the various terms in representative Claim 2, the constructions of record largely incorporate generic definitions and descriptions from the specification. By stipulation of the parties, "profile," "user profile," and "profile information" mean "information about a user of the website." "Application" means "a unit of content provided on a web site" and "configurable application" means "an application that can be

modified and/or configured by a user of the web site." "Business rule(s)" and "rule" mean "any rule incorporated into a system that controls how the system functions." "Administrator portal" means "interface used to manage applications and/or business rules" and "administrator" means "any user of the web site that has the ability to create, update, delete, and/or schedule a business rule of the web site." Stipulation 1-2, ECF No. 70 at PageID.1833-1834. *See also* '720 Patent 10:27-28 (describing a "profile"), 5:20-21 (defining "application"), 5:45-46 (defining "configurable application"), 8:29-30 (defining "business rule"), 7:20-22 (describing an "administrator portal"), 9:22-27 (describing an "administrator"), ECF No. 124-2 at PageID.7021-7023.

At the claim construction stage of this case, among other terms in representative Claim 2, the parties requested that the Court construe the term "configurable link." The Court construed the term to mean "a mechanism by which a user of a web site activates an application, where the mechanism can be modified or configured by the user as permitted by any relevant business rules." *Markman* Order 11-12, ECF No. 97 at PageID.3178-3179. *See also* '720 Patent 5:53-54 (defining "link"), 5:62-64 (defining "configurable link"), ECF No. 124-2 at PageID.7021. As noted above, according to the claim language, the configurable access rule is configurable by an administrator, and the configurable link is generated by the computer based on a user profile and the configurable access rule. Put together with the Court's construction, Zak reads the claim language

as reciting that the configurable link can be modified or configured by an administrator by modifying or configuring the configurable access rule.

The parties have also raised a number of disputed issues of claim construction for the first time on summary judgment. In this opinion and order, the Court will address the disputed issues of claim construction in the contexts in which they are raised by the parties. At the outset, the Court notes that the written briefs bear no resemblance to formal *Markman* briefs. Most notably, despite asking the Court to resolve disputed issues of claim construction, the parties for the most part do not offer proposed constructions. As such, the written briefs contain none of the usual arguments and counterarguments on proposed constructions typically crucial to informing the Court's understanding of the proper constructions of the terms. Accordingly, the Court will address the disputed issues of claim construction to the extent possible on the limited record.[4]

## IV. LEGAL STANDARDS

"Summary judgment is as available in patent cases as in other areas of litigation." *Cont'l Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1265 (Fed. Cir. 1991).

---

[4] The Court has previously set forth a detailed description of the law of claim construction. *Markman* Order, ECF No. 97. The Court hereby incorporates this description by reference. *See id*. 5-11, ECF No. 97 at PageID.3172-3178. In this opinion and order, the Court will cite only the authority needed to resolve the disputed issues of claim construction.

### A. Standard for Summary Judgment

Under Rule 56, summary judgment is proper when there is "no genuine dispute as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial. *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

In order to succeed on its motion for summary judgment, the moving party must show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 322. The moving party discharges its burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."

*Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325). The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton*, 369 F.3d at 909 (citing *Matsushita*, 475 U.S. at 587). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251-52.

The existence of a factual dispute alone does not, however, defeat a properly supported motion for summary judgment—the disputed factual issue must be material. "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find . . . that the plaintiff is entitled to a verdict—'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" *Id.* at 252 (alteration in original) (citation omitted). A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted).

## B. Infringement

A patent is infringed when one "without authority makes, uses, offers to sell, or sells any patented invention, within the United States,

or imports into the United States any patented invention during the term of the patent therefor." 35 U.S.C. § 271(a). Infringement of a patent, "whether literal or under the doctrine of equivalents, is a question of fact." *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129-30 (Fed. Cir. 2011). "Summary judgment of non-infringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim is found in the accused device literally or under the doctrine of equivalents." *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1317 (Fed. Cir. 2015). "Where . . . the parties do not dispute any relevant facts regarding the accused product but disagree over which of two possible meanings of [a particular claim] is the proper one, the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment." *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996).

## V. INFRINGEMENT ANALYSIS

In his infringement contentions, Zak alleges that Facebook infringes the asserted claims in connection with two features, both of which are presented on two different "surfaces" for accessing Facebook content. Likely familiar to most people, the surfaces at issue are: (1) the Facebook and Instagram desktop and mobile web sites (e.g., www.facebook.com and m.facebook.com) (collectively, the "accused web sites") and (2) the Facebook and Instagram Apple iOS and Google Android native mobile software applications (collectively, the "accused

12

native apps"). The two features at issue are: (1) Targeted Advertising ("targeted ads") and (2) their associated Why Am I Seeing This? information ("WAIST").

For both the accused web sites and the accused native apps, Zak alleges that targeted ads and WAIST are configurable applications, and that links presented with targeted ads for opening targeted ads pages and WAIST pages are configurable links. *See generally* Facebook's Reply Ex. 14 ("Infringement Contentions"), ECF No. 152-9.

Facebook moves for partial summary judgment of non-infringement on two grounds. First, Facebook explains that from a behind the scenes technical standpoint, the accused native apps operate differently from the accused web sites to present targeted ads to Facebook users. While Facebook does not move for summary judgment as to the accused web sites, it argues that summary judgment is appropriate as to the accused native apps because the alleged configurable links are not on web sites. Second, Facebook explains that targeted ads are configured by third party advertisers and then presented to their chosen types of Facebook users. As to targeted ads and WAIST, Facebook argues that summary judgment is appropriate because the same users who can configure the alleged configurable links are not also presented with them to activate the alleged configurable applications.

For the reasons set forth below, the Court finds that Facebook is entitled to summary judgment of non-infringement as to the accused

native apps. However, the Court finds that Facebook is not entitled to summary judgment of non-infringement as to targeted ads and WAIST.

### A. Native Apps

At the outset, the Court notes that it will consider and incorporate into this opinion and order arguments raised by Zak at oral argument. As will become clear from the below discussion of their positions on infringement, the dispute between the parties centers on the meaning of the term "web site." To summarize the written briefs, Facebook moves for summary judgment on the assumption that "web site" should be given its ordinary meaning, Zak argues in opposition that the term should be given a special definition from the specification, and Facebook argues in reply that Zak disavowed broad coverage under the special definition of the term during an IPR proceeding. While Facebook ideally would have acknowledged the special definition of the term and raised Zak's disavowal in the first instance when moving for summary judgment, its reply argument is, first, properly responsive, and second, persuasive. At the same time, the fact remains that Zak's opposition argument is directed to the special definition of the term. Accordingly, at oral argument, the Court gave Zak a full opportunity to be heard in connection with the ordinary meaning of the term. *See generally* Mot. Hr'g Tr. 74:18-78:22, 81:16-82:14, 85:11-87:14, ECF No. 162 at PageID.10256-10260, 10263-10264, 10267-10269.

14

Turning to the dispute between the parties, the term "web site" appears throughout representative Claim 2. Relevant to the accused native apps, according to the claim language, the configurable link is "on the web site" first introduced in the preamble. '720 Patent 22:52-23:20, ECF No. 124-2 at PageID.7029-7030.

Facebook explains that from a behind the scenes technical standpoint, the accused native apps operate differently from the accused web sites to present targeted ads to Facebook users. Among other things, Facebook distinguishes between the accused web sites and their use of Hypertext Markup Language (HTML), a "markup language" existing at the time of the invention, and the accused native apps and their use of GraphQL, a more recent "query language" developed by Facebook. As to the differences between the accused web sites and the accused native apps, Facebook submits a declaration from its software engineer, Mr. Chahar, and definitions of "Web site" and related terminology from a computer dictionary. Chahar Decl., ECF No. 144-1; Facebook's Mot. Ex. 2 ("Computer Dictionary"), ECF No. 124-3.

Mr. Chahar testifies that "GraphQL is entirely different from HTML and unlike HTML, is not designed as a way of formatting and rendering web sites." Mr. Chahar describes that in web sites, web browsers receive web page HTML from servers, and then present web pages based on their interpretation of instructions in the HTML. Chahar Decl. ¶ 7, ECF No. 144-1 at PageID.9359-9360. Consistent with Mr.

15

Chahar's description of web sites, the computer dictionary defines "Web site" as a "group of related HTML documents and associated files, scripts, and databases that is served up by an HTTP server on the World Wide Web" accessible via a "Web browser and an Internet connection," "Web page" as a "document on the World Wide Web" that "consists of an HTML file with associated files for graphics and scripts," and "HTML" as the "markup language used for documents on the World Wide Web" used to "format documents that can then be interpreted and rendered by an Internet browser." Computer Dictionary 258-59 (defining "HTML"), 564 (defining "Web page" and "Web site"), ECF No. 124-3 at PageID.7038-7040. Mr. Chahar describes that the accused native apps, on the other hand, use GraphQL to request information from servers, and then present the information based on the logic and instructions written for them in their own software. Chahar Decl. ¶ 7, ECF No. 144-1 at PageID.9359-9360.

Zak does not dispute Mr. Chahar's description of web sites or the computer dictionary's definitions of "Web site" and related terminology. Nor does Zak dispute Mr. Chahar's description of the accused native apps. However, Zak explains that similar to the accused web sites, the accused native apps involve "web" content, "web" servers, and the Hypertext Transfer Protocol (HTTP). For example, the accused native apps present the same or similar content as the accused web sites, and, while using GraphQL instead of HTML, receive the content from World Wide Web

16

servers. Moreover, GraphQL is served over HTTP, the same protocol used in web sites to serve up web page HTML. Zak also explains that the accused native apps use "web views," referring to an additional interface for displaying the mobile version of the accused web sites within the accused native apps. Relevant to the alleged configurable links, the accused native apps open WAIST pages in web views. *See* Zak's Opp'n Br. 7-13 (Counter-Statement of Material Facts 10.1-10.8, 11.1-11.2 (citing sealed deposition testimony, discovery documents, and technical expert report)), ECF No. 133 at PageID.7554-7560.

As to the accused native apps, Facebook argues that summary judgment is appropriate because the alleged configurable links are not, in accordance with the ordinary meaning of the term, on web sites. Zak, on the other hand, argues that summary judgment is not appropriate because the alleged configurable links are, in accordance with a special definition of the term from the specification, on network interfaces.

### 1. "Web Site"

As their positions on infringement imply, the parties have raised a disputed issue of claim construction concerning the term "web site." The parties did not raise any issues concerning the meaning of the term at the claim construction stage of this case.

Facebook does not offer a proposed construction, but the essence of its summary judgment argument is that the ordinary meaning of the term involves web pages, web browsers, and HTML. *See Phillips v. AWH*

*Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (explaining that terms are generally given their "ordinary and customary" meaning). Zak argues in opposition that Facebook ignores the specification. More specifically, Zak argues that the specification contains a special definition of the term as "any form of network interface." *See id.* at 1316 (explaining that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess"). Facebook argues in reply that Zak ignores the prosecution history. More specifically, Facebook argues that during an IPR proceeding, Zak disavowed broad coverage under the special definition of the term. *See id.* at 1317 (explaining that the prosecution history can demonstrate "whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be").

The Court will first consider the intrinsic evidence of record. As to the special definition of the term, Zak points to a "web site" definition in the specification. The specification circularly defines "web site" to include both true web sites (i.e., a "web page on the World Wide Web") and "any other form of network interface":

> The invention is a system and method (collectively the "system") for automatically creating, updating, scheduling, removing, and otherwise managing content accessible from a network interface, such as an Internet location

("Internet site"), an intranet location ("intranet site"), an extranet location ("extranet site"), a web page on the World Wide Web, or any other form of network interface (collectively "web site").

'720 Patent 3:28-34, ECF No. 124-2 at PageID.7020.

Facebook does not dispute that the specification contains a special definition of the term. In the absence of proposed constructions and formal *Markman* briefs, the Court accepts that in the context of the '720 Patent, "web site" has a special definition of "any form of network interface."

While this "lexicography" would normally govern, here, the analysis must continue because Facebook argues that Zak disavowed broad coverage under the special definition of the term during an IPR proceeding. *Phillips*, 415 F.3d at 1316-17. Facebook's argument refers to the doctrine of prosecution disclaimer. "As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). When a patentee unequivocally disavows the meaning of a term, "the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Id.* at 1325. However, courts must reject statements that are too vague or ambiguous to qualify as disavowing. *Id.* Rather, disavowing statements must be "so clear as to

19

show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer." *Id.* (internal citation omitted). In accordance with these principles, the Federal Circuit, noting that "many district courts," including this one, "have addressed this issue," has held that "statements made by a patent owner during an IPR proceeding, whether before or after an institution decision, can be considered for claim construction and relied upon to support a finding of prosecution disclaimer." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1361-62 (Fed. Cir. 2017) (citing *Signal IP, Inc. v. Fiat U.S.A., Inc.,* No. 14-cv-13864, 2016 U.S. Dist. LEXIS 127640, at *46-48 (E.D. Mich. Sept. 20, 2016)).

Turning to the IPR proceeding, Facebook submits Zak's preliminary response to one of Facebook's IPR petitions and the PTAB's corresponding institution decision. Facebook's Reply Ex. 7 ("Preliminary Response"), ECF No. 152-2; Ex. 8 ("Institution Decision"), ECF No. 152-3. During the IPR proceeding, Facebook argued that "application" should be construed to mean a "unit of content on a network site" and that "link" should be construed to mean a "mechanism to activate an application on a network site." Zak acknowledged that Facebook's proposed constructions adopted "application" and "link" definitions from the specification. However, compared to Facebook's proposed constructions, Zak's proposed constructions substituted "network site" with "web site."

Citing the preamble of representative Claim 2, Zak argued that Facebook's proposed constructions were "unreasonably broad" because the challenged claims "are all directed to managing content on a web site." A "web site," Zak maintained, is "a particular type of network site" and is "narrower than a network site." Preliminary Response 6-8 (emphasis omitted), ECF No. 152-2 at PageID.9579-9581. While finding "no reason to limit the scope of [each term] itself," the PTAB, citing the preambles of the challenged claims, accepted that "additional limitations narrow the scope of the claims to a 'web site.'" Institution Decision 6-7 (construing "application"), 9-11 (construing "link"), ECF No. 152-3 at PageID.9612-9613, 9615-9617.

The Court finds that the doctrine of prosecution disclaimer applies to Zak's statements during the IPR proceeding. In urging the PTAB not to institute an IPR, Zak unequivocally disavowed "unreasonably broad" coverage of network sites in favor of "particular" and "narrower" coverage of web sites. Notably, Zak's distinction between network sites and web sites is irreconcilable with the special definition of the term, including the underlying circular "web site" definition in the specification. At first glance, the irreconcilability could be read as making Zak's statements too vague or ambiguous to qualify as disavowing. But because the intention to disavow broad coverage of network sites is clear and unmistakable, any vagueness or ambiguity merely goes to the underlying motivation. The irreconcilability, instead, makes it clear that Zak had abandoned the

special definition of the term. And because not only the term "web site," but also the related term "web pages," appear together throughout the challenged claims, Zak's abandonment of "any form of network interface" can only be read to have been in favor of true web sites. Accordingly, given Zak's statements during the IPR proceeding, the Court finds that rather than its special definition, "web site" should be given its ordinary meaning.

The Court will next consider the extrinsic evidence of record. Zak does not dispute Mr. Chahar's description of web sites or the computer dictionary's definitions of "Web site" and related terminology. Likewise, Zak does not dispute that the term has an ordinary meaning. Rather, Zak only argues that the special definition of the term "trumps" its ordinary meaning. In the absence of proposed constructions and formal *Markman* briefs, the Court accepts that "web site" has an ordinary meaning involving web pages, web browsers, and HTML. The Court notes that in addition to informing the ordinary meaning of the term, the undisputed extrinsic evidence informs the intrinsic evidence. For example, as to the circular "web site" definition in the specification, it confirms that a "web page on the World Wide Web" refers to true web sites. Similarly, as to Zak's statements during the IPR proceeding, it confirms that the terms "web site" and "web pages" are related, and that because they appear together throughout the challenged claims, Zak's abandonment of "any

form of network interface" can only be read to have been in favor of true web sites.

### 2. Analysis

Although the Court has resolved the disputed issue of claim construction in Facebook's favor and found that the term "web site" should be given its ordinary meaning, Zak urges the Court to consider the evidence of record, arguing that it demonstrates that the alleged configurable links are on web sites, or at minimum, creates a genuine dispute on this point.

As to the claim language reciting that the configurable link is "on the web site," Zak does not dispute Facebook's representation that Zak has not disclosed a theory of infringement under the doctrine of equivalents. The Court must therefore consider Zak's arguments in the context of literal infringement. In the literal infringement analysis, each and every limitation in a claim is "deemed material to defining the invention's scope." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 18 (1997). "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). "If even one limitation is missing or not met as claimed, there is no literal infringement." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1350 (Fed. Cir. 1999) (quotation and citation omitted).

Zak raises two arguments in an effort to show that the accused native apps, themselves, are web sites, one directed to claim construction and one directed to their similarity to the accused web sites.

On the issue of claim construction, Zak points to the special definition of the term and the prior art references at issue in the IPR proceeding. Zak argues that under the doctrine of prosecution disclaimer, Zak's statements only qualify as disavowing with respect to coverage of prior art network interfaces that Zak expressly distinguished from web sites. Zak maintains that because it did not yet exist at the time of the invention, the technology of the accused native apps—in Zak's words, "mobile applications that display web content"—was necessarily not expressly distinguished. Zak suggests that the term should therefore be understood to mean "any form of network interface," excluding only expressly distinguished prior art network interfaces, thus including "mobile applications that display web content." *See generally* Mot. Hr'g Tr. 74:18-78:22, ECF No. 162 at PageID.10256-10260.

The Court must reject Zak's claim construction argument. First, with respect to the IPR proceeding, Zak's disavowal did not arise in the context of distinguishing prior art network interfaces. Rather, it arose in the context of claim construction. In the context of claim construction, Zak, emphasizing what the challenged claims "are all directed to," unequivocally disavowed "unreasonably broad" coverage of network sites in favor of "particular" and "narrower" coverage of web sites. Second, with

respect to the technology of the accused native apps, Zak maintains that the reason it was necessarily not expressly distinguished is that it did not yet exist at the time of the invention. But for the same reason, the only support in the specification for coverage of "mobile applications that display web content" is the special definition of the term. Because Zak abandoned "any form of network interface" in favor of true web sites, representative Claim 2 cannot be considered to have been "drafted broadly enough" for the "after-arising technology to be captured within the literal scope." *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1371-72 (Fed. Cir. 2008); *see also Schering Corp. v. Amgen Inc.*, 222 F.3d 1347, 1353-54 (Fed. Cir. 2000) (holding that literal claim scope cannot be expanded through claim construction to capture after-arising technologies). Third, Zak effectively asks the Court to find, in contradiction to both the intrinsic evidence and the undisputed extrinsic evidence, that "web site" should be construed to mean true web sites *and also the technology of the accused native apps*. However, this would amount to the Court impermissibly "tailoring a claim construction to fit the dimensions of the accused product or process." *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1331 (Fed. Cir. 2006).

With respect to their similarity to the accused web sites, Zak points out that the accused native apps present the same or similar content, receive the content from World Wide Web servers, and use GraphQL, which is served over HTTP. However, with the exception of their use of

web views, discussed below, Zak does not dispute the lack of evidence that the accused native apps involve web pages, web browsers, and HTML. Rather than proving the point, Zak's emphasis on "web" content, "web" servers, and HTTP underscores that whatever their similarity to the accused web sites, the accused native apps are not, in accordance with the ordinary meaning of the term, web sites. Accordingly, Zak has not come forward with evidence that either demonstrates that the accused native apps are web sites or creates a genuine dispute on this point.

Zak also argues that the alleged configurable links are on web sites when the accused native apps open WAIST pages in web views. Facebook does not dispute that the accused native apps open WAIST pages in web views. However, Facebook argues that Zak does not identify how, when the accused native apps open WAIST pages in web views, the alleged configurable links are on web sites. Facebook's Reply Br. 3 (arguing that "Zak's opposition does not even contend that a 'configurable link' is provided in a web view"), ECF No. 152 at PageID.9562.

The Court agrees with Facebook. Zak separately explains that the alleged configurable links are URLs presented with targeted ads for opening WAIST pages, that GraphQL uses URLs to log when Facebook users view targeted ads, and that the accused native apps open WAIST pages in web views. *See* Zak's Opp'n Br. 9-12 (Counter-Statement of Material Facts 10.6-10.8 (citing sealed deposition testimony and discovery documents)), 13-14 (responding "Admitted" to Facebook's

Statement of Material Fact 13 (citing sealed technical expert report identifying the alleged configurable links as   "the URL used for accessing . . . WAIST content")), ECF No. 133 at PageID.7556-7561.

However, Zak does not connect these separate explanations in a way that identifies how opening WAIST pages in web views satisfies the claim language and the constructions of record. According to the claim language, the configurable link that points to the configurable application is what must be "on the web site." By stipulation of the parties, "application" means "a unit of content provided on a web site," and at the claim construction stage of this case, the Court construed "configurable link" to mean in part "a mechanism by which a user of a web site activates an application." *See supra* Section III(C) (summarizing the constructions of record). Put in terms of the claim language and the constructions of record, Zak identifies how the alleged configurable applications are provided on web sites, but not how the alleged configurable links to activate them are on web sites. Accordingly, Zak has not come forward with evidence that either demonstrates that the alleged configurable links are on web sites or creates a genuine dispute on this point.

Having considered the written briefs, relevant caselaw, and the evidence of record, the Court concludes that there is no genuine dispute that the alleged configurable links are not on web sites. As to the accused native apps, the Court therefore finds that Facebook is entitled to summary judgment of non-infringement.

## B. Targeted Ads and WAIST

At the claim construction stage of this case, the Court construed "configurable link" to mean "a mechanism by which a user of a web site activates an application, where the mechanism can be modified or configured by the user as permitted by any relevant business rules." *See supra* Section III(C) (summarizing the constructions of record).

As to targeted ads and WAIST, a dispute has emerged between the parties concerning how to read the language of the Court's construction. The dispute concerns whether, by using "the" user after "a" user, the language imposes a "same" user requirement. The parties frame the dispute in terms of whether the antecedent basis rule, which both the USPTO and courts apply strictly to claims, also applies to claim constructions. *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008).

As noted above, Zak alleges that targeted ads and WAIST are configurable applications, and that links presented with targeted ads for opening targeted ads pages and WAIST pages are configurable links. Facebook, explaining that targeted ads are configured by third party advertisers and then presented to their chosen types of Facebook users, argues that summary judgment is appropriate because the same users who can configure the alleged configurable links are not also presented with them to activate the alleged configurable applications.

Turning to the language of the Court's construction, in accordance with their positions on infringement, Facebook urges, and Zak urges against, application of the antecedent basis rule. More specifically, Facebook argues that the language should be read to mean that the same user who can modify or configure the mechanism can also use the mechanism to activate the application. Zak, on the other hand, argues that the language should be read to cover the scenario where one user can modify or configure the mechanism and the same or another user can use the mechanism to activate the application.

To the extent the language imposes a same user requirement, Zak requests reconsideration of the Court's construction. Facebook argues that it would be unduly prejudiced by reconsideration because it formulated its non-infringement and invalidity positions in reliance on the Court's construction.

### 1. "Configurable Link"

The Court need not resolve the issue of whether the antecedent basis rule applies to claim constructions. Whether under the antecedent basis rule or as a matter of grammar, the language clearly imposes a same user requirement. The real issue is whether the proper construction of the term *should* impose a same user requirement. Notably, the parties did not raise this issue at the claim construction stage of this case. Rather, for its construction of the term, the Court adopted stipulated language from the parties' proposed constructions. The Court noted its assumption

that as opposed to imposing any particular requirements, the parties merely intended for the stipulated language to incorporate the "link" and "configurable link" definitions from the specification. *Markman* Order 11-13, ECF No. 97 at PageID.3178-3180.

In requesting reconsideration of the Court's construction, Zak argues that to the extent it imposes a same user requirement, the stipulated language is inconsistent with the asserted claims and the specification. The Court agrees. The specification defines a "link 32" as "the mechanism by which the user 50 of a network site 34 activates the application 30" and a "configurable link 32" as a "link 32 that can be modified or configured by the content provider 22 as permitted by any relevant business rules." '720 Patent 5:53-54 (defining "link"), 5:62-64 (defining "configurable link"), ECF No. 124-2 at PageID.7021. As the numbering implies, the specification describes the content providers 22 and the users 50 as two different types of users. The content providers 22 provide content, manage content, and, acting as administrators, manage the business rules. *Id.* 3:52-4:5, ECF No. 124-2 at PageID.7020. The users 50 can, depending on the context, be the content providers 22 or the administrators. But generally, "in contrast to content providers 22," the users 50 are the ones who access content. *Id.* 6:30-46, ECF No. 124-2 at PageID.7021. Consistent with the specification, the asserted claims distinguish between "user(s)" generally and "a user acting in the role of an administrator" with respect to the configurable link. Representative

30

Claim 2, a "system" claim whose claim language involves generating, but not necessarily using, the configurable link, does not place any limitation on which users can or cannot use the configurable link to activate the configurable application. And independent Claim 7, a "method" claim whose claim language does involve using the configurable link, only specifies that "a selection of the configurable link" be "by one of the users who is permitted to view the configurable application." *Id.* 22:52-23:20 (representative Claim 2), 23:44-24:19 (independent Claim 7), ECF No. 124-2 at PageID.7029-7030.

In summary, by imposing a same user requirement, the stipulated language improperly narrows the scope of the term to exclude the basic scenario where one user (i.e., a content provider 22 acting as an administrator) can modify or configure the mechanism and another user (i.e., a user 50) can use the mechanism to activate the application. Because the Court adopted the stipulated language for its construction of the term, the Court's construction requires modification. To remove the implication of a same user requirement, the Court finds that "configurable link" should be construed to mean "a mechanism by which a user of a web site activates an application, where the mechanism can be modified or configured by a user as permitted by any relevant business rules." Compared to its original construction, the Court replaces "the user" with a second instance of "a user" to clarify that one user can modify or

configure the mechanism and the same or another user can use the mechanism to activate the application.

To the extent it relied on the Court's original construction, Facebook brought any perceived prejudice on itself because its reliance was unreasonable. Initially, it is well established that the Court "may engage in claim construction during various phases of litigation, not just in a *Markman* order." *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1359 (Fed. Cir. 2006). More importantly, in this case, the parties did not raise the issue of whether the proper construction of the term should impose a same user requirement at the claim construction stage, and now that this issue has been raised, Facebook does not counter Zak's argument that the stipulated language is inconsistent with the asserted claims and the specification. In the circumstances of this case, Facebook's reliance on the Court's original construction amounts to an unreasonable expectation that this issue would continue to be overlooked as the parties further developed the infringement and validity issues.

### 2. Analysis

Having resolved the disputed issue of claim construction in Zak's favor, the written briefs reveal that there is no genuine dispute that one user can modify or configure the alleged configurable links and the same or another user can use the alleged configurable links to activate the alleged configurable applications. *See* Facebook's Mot. Br. 9 (Statement of Material Fact 16 (citing sealed technical expert report where "Zak and

his expert presented screenshots and examples of third party ads presented to users on Facebook and Instagram")), ECF No. 124 at PageID.6986. As to targeted ads and WAIST, the Court therefore finds that Facebook is not entitled to summary judgment of non-infringement.[5]

---

[5] Facebook raised an additional non-infringement position as to targeted ads and WAIST for the first time at oral argument. More specifically, Facebook argued that summary judgment is appropriate because Facebook users are not "each . . . permitted to act in the role of an administrator at least with respect to a subset of web pages on the web site." *See generally* Mot. Hr'g Tr. 66:9-70:8, ECF No. 162 at PageID.10248-10252; '720 Patent 23:3-11 (representative Claim 2), 23:64-24:5 (independent Claim 7), ECF No. 124-2 at PageID.7030. But this is not the non-infringement position that Facebook raised and Zak addressed in the written briefs. As opposed to the stipulated language concerning the mechanism and a user who can modify or configure the mechanism, or the related claim language concerning a user who can act as administrator with respect to the configurable link, Facebook's argument refers to different claim language concerning the administrator portal and users who can act as administrators with respect to web pages. *See* Mot. Hr'g Tr. 79:18-21 (Zak's counsel noting that "Facebook has changed their argument a little bit" and "that's not really what I got from the briefs"), ECF No. 162 at PageID.10261. Arguments raised for the first time at oral argument are not properly before the Court. *See*, *e.g.*, *Van Sickle v. Automatic Data Processing, Inc.*, 952 F. Supp. 1213, 1221 (E.D. Mich. 1997) (noting that summary judgment was not appropriate on an issue raised for the first time at a hearing because the opposing party did not have an opportunity to respond). Accordingly, the Court must decline to consider this non-infringement position.

## VI. CONCLUSION

For the reasons stated in this opinion and order, the Court will **GRANT** in part and **DENY** in part Facebook's motion for partial summary judgment of non-infringement.

**SO ORDERED.**

Dated: September 30, 2021

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

## Certificate of Service

I hereby certify that this Order was electronically filed, and the parties and/or counsel of record were served on September 30, 2021.

s/A. Chubb
Case Manager